IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) |
| SAMUEL BARNES, | )   Criminal Action No. 23-12 (MN) |
| | ) |
| Defendant. | ) |

## MEMORANDUM ORDER

At Wilmington this 8th day of June 2024:

Defendant, Samuel Barnes, was originally charged with possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). (D.I. 2). He moved to dismiss the charge, arguing that 18 U.S.C. § 922(g)(l) is unconstitutional both on its face and as applied to him following *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022) and *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (*en banc*). (D.I. 46). That motion has been fully briefed. (D.I. 48, 52). In a superseding indictment, Defendant was also charged with the unlawful possession of a firearm with a removed, obliterated or altered serial number, in violation of 18 U.S.C. §§ 922(k) and 924(a)(l)(B). (D.I. 51). He moved to dismiss that charge as well, arguing that it is facially unconstitutional. (D.I. 61). The government responded on January 10, 2024. (D.I. 64). Defendant replied on May 21, 2024. (D.I. 67). Having carefully reviewed the submissions, I will deny Defendant's motions.

### I.     BACKGROUND

The government alleges that in January of 2022, while executing a search warrant, law enforcement found Samuel Barnes and his firearm in a house they had tied to drug trafficking. In a room that Barnes later admitted was his bedroom, officers found a box of 9 mm ammunition, a magazine on the floor, a magazine inside the headboard, a digital scale with white

residue on the dresser next to the bed, 11 grams of cocaine inside the dresser, $6,025 in cash in a jean jacket on the dresser and another box of ammunition in the closet. In the closet of another bedroom on the second floor, police found a Masterpiece Arms Grim Reaper 9mm pistol with an obliterated serial number. The gun was not loaded and had no magazine inside but, about a foot away, was an extended magazine loaded with 20 rounds of 9 mm ammunition. The gun and magazine were stashed behind baby clothes and other baby items.

This is not Defendant's first interaction with the criminal justice system. He has the following prior felony convictions: 1) in May of 2000 in Delaware Superior Court for distribution of drugs within 300 feet of a park, aggravated menacing, and carrying a concealed deadly weapon, all of which arose from separate arrests and which resulted in a six month prison sentence; 2) in June of 2000 in Delaware Superior Court for Possession of a Schedule II Controlled Substance with Intent to Distribute, which again resulted in a six month prison sentence; (3) in July of 2001 for distribution of drugs within 300 feet of a park, which resulted in an eight-month prison sentence; (4) in October of 2003 for Escape after Conviction, for which he served a 90-day sentence; (5) in 2006 in the Eastern District of Pennsylvania for possession of a stolen firearm, which resulted in a 10-year sentence; and (6) in 2016 in this Court, which resulted in an 82-month sentence (64 months for distribution of a controlled substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 841(a)(l) and 841(b)(l)(C) plus 18 consecutive months for violating his federal supervised release). Defendant was on federal supervised release for the 2016 conviction at the time of this offense.

II.     **ANALYSIS**

The Second Amendment protects "the right of the people to keep and bear arms." U.S. Const. amend. II; *see District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). That right, however, is "not unlimited." *Heller*, 554 U.S. at 626. Instead, the Second Amendment allows for

a "variety" of firearm regulations, including the "longstanding prohibitions on the possession of firearms by felons." *Id.* at 626, 636; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' . . . . We repeat those assurances here.") (citation omitted).

In *Bruen*, the Supreme Court revisited its Second Amendment jurisprudence, rejecting the two-step framework that various Courts of Appeals had adopted in the years following *Heller* and *McDonald*.[1] *See Bruen*, 597 U.S. at 17-24. The Supreme Court found that the second step – applying means-end scrutiny to the challenged regulation – had no place in the constitutional analysis. *See id.* at 19 ("But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context."). Instead, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 24.

Under *Bruen*, when a regulation is challenged, a court must ask (1) whether the regulation covers conduct protected by the text of the Second Amendment and, if so, (2) whether the government has shown that regulation is consistent with the historical tradition of firearm regulation in this country. *Bruen*, 597 U.S. at 24; *see also Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 101 (3d Cir. 2023) (en banc) ("After *Bruen*, we must first decide whether the text of the Second Amendment applies to a person and his proposed conduct. If it does, the government now bears the burden of proof: it 'must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'" (quoting *Bruen*, 597 U.S. at 24)). This inquiry searches for a relevantly similar

---

[1] The two-step approach generally asked whether the challenged regulation burdened conduct covered by the Second Amendment, followed by an assessment of the regulation's constitutionality using means-end scrutiny. The Third Circuit used this approach. *See United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010).

3

firearm regulation that existed at the time of the Second Amendment's adoption. In assessing whether regulations are "relevantly similar under the Second Amendment, . . . *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are **central** considerations when engaging in an analogical inquiry." *Id.* (cleaned up). "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 30 (emphases in original).

### A.  18 U.S.C. § 922(g)(1)

I agree with Judge Connolly's recent observation that, "[g]iven the numerous opinions of district courts in this Circuit that have addressed [the constitutionality of § 922(g)(1)] in the last year and the pending appeals of many of those decisions, . . . there will be a controlling decision from the Third Circuit in the near future." *United States v. Perez*, CR 22-55-CFC, 2024 WL 579115, at *1 (D. Del. Feb. 13, 2024) (citing cases in the Third Circuit). He further noted that *United States v. Rahimi*, then pending before the Supreme Court may provide additional guidance. *Id.* Indeed, the Supreme Court has now decided *Rahimi* and provided that guidance, reiterating the proviso in *Heller* that the Second Amendment "right [is] not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *United States v. Rahimi*, No. 22-915, 2024 WL 3074728 (U.S. June 21, 2024) (upholding the constitutionality of § 922(g)(8), on the grounds that an individual who "has been found to pose a credible threat to the physical safety of another, that individual may be temporarily disarmed consistent with the Second Amendment."

Although, the majority opinions in *Rahimi* and *Bruen* did not address the constitutionality of § 922(g)(1), as Judge Marston in the Eastern District of Pennsylvania recognized, six Justices through concurring and dissenting opinions, suggested that *Bruen* did not call into question the constitutionality of that statute. *See United States v. Canales*, CR 21-226-KSM, 2023 WL 8092078, at *3 (E.D. Pa. Nov. 20, 2023). Based on these reasoned opinions and the Supreme Court's "assurances" in *Heller*, I agree that Second Amendment does not render § 922(g)(1) facially unconstitutional. *See Perez*, 2024 WL 579115, at *1.

Turning to Defendant's challenge to § 922(g)(1) as applied to him, the government concedes that under *Range*, Defendant is one of "the people" protected by the Second Amendment. (D.I. 64 at 21). It argues, however, that his actions fall outside the scope of the Second Amendment protection. I agree. Here, Defendant was subject to a term of supervised release from this Court at the time of the current offense conduct. "Arrest and incarceration naturally entail the loss of a wide range of liberties-including the loss of access to weapons." *United States v. Rahimi*, 61 F.4th 443, 464 (5th Cir. 2023) (Ho, J., concurring) (2023). Although supervised release is a lesser form of custody than incarceration, it is still a custodial component of a criminal sentence. *See, e.g.*, *Gall v. United States*, 552 U.S. 38, 48 (2007) (explaining that a term of supervised release is a form of punishment that involves restrictions on liberty); *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) ("To a greater or lesser degree, it is always true of probationers (as we have said it to be true of parolees) that they do not enjoy 'the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions.'") (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)). Therefore, the Second Amendment protection did not apply to Defendant's possession of a firearm at the time of the offense charged here. *See e.g.*, *United States v. Shaw*,

2023 WL 3619416, at *4-7 (D.D.C. May 24, 2023) ("[A]ny Second Amendment right applicable here may be limited during the period of probation, just as other myriad constitutional rights are.").

Moreover, even if that were not so, Defendant's myriad of prior felony drug and gun convictions place him in the category of dangerous individuals that the government has historically sought fit to disarm. Accordingly, § 922(g)(l) as applied to Defendant does not violate the Second Amendment. *See Canales*, 2023 WL 8092078, at *5 (denying motion to dismiss as-applied challenge to § 922(g)(l), as "Canales's [three] prior drug related felonies . . . are a far cry from Range's singular, 28-year-old conviction for making a false statement on a food stamps application to help his struggling family"); *Perez*, 2024 WL 579115, at *2 (denying motion to dismiss as-applied challenge to § 922(g)(l) in light of his three drug felony convictions.).

B.  **18 U.S.C. § 922(k)**

Defendant argues that § 922(k) is unconstitutional on its face under the revised framework announced in *Bruen*. "A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications." *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019); *see also United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) ("A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case."). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2022) (en banc). In the wake of *Bruen*, to defeat a facial challenge under the Second Amendment, "all the government must do is identify constitutional applications – even if they are unrelated to [the

6

defendant]'s conduct – using the same text-and-historical-understanding framework." *United States v. Veasley*, 98 F.4th 906, 910 (8th Cir. 2024).

To date, no Court of Appeals has found § 922(k) unconstitutional on its face under *Bruen*. Of the multiple District Courts to have addressed the constitutionality of § 922(k), the vast majority, have upheld its constitutionality. *See United States v. Ortiz,* No. 3:22-CR-0020, 2024 WL 1554868 (D.V.I. Apr. 10, 2024) (upholding constitutionality of § 922(k)); *United States v. Alberts*, No. CR 23-131-BLG-SPW, 2024 WL 1486145, at *1 (D. Mont. Apr. 5, 2024) (same); *United States v. Sing-Ledezma,* ---F. Supp. 3d.---, 2023 WL 8587869, at *3-*5 (W.D. Tex. Dec. 11, 2023) (same); *United States v. Dixson,* 2023 WL 7102115, at *2-*3 (E.D. Mo. Oct. 26, 2023) (same); *United States v. Dangleben,* 2023 WL 6441977, at *4-*9 (D.V.I. Oct. 3, 2023) (same); *United States v. Patton,* 2023 WL 6230413, *2-*4 (D. Neb. Sept. 26, 2023) (same); *United States v. Sharkey,* ---F. Supp. 3d---, 2023 WL 6139615, at *2-*3 (S.D. Iowa Sept. 20, 2023) (same); *United States v. Avila,* ---F. Supp. 3d---, 2023 WL 3305934, at *4-*5 (D. Col. May 8, 2023) (same); *United States v. Trujillo,* ---F. Supp. 3d---, 2023 WL 3114387, at *3-*6 (D.N.M. Apr. 26, 2023) (same); *United States v. Walter,* 2023 WL 3020321, at *4-*5 (D.V.I. Apr. 20, 2023) (same); *United States v. Bradley,* 2023 WL 2621352, at *3-*5 (S.D. W. Va. Mar. 23, 2023) (same); *United States v. Serrano,* 651 F. Supp. 3d 1192, 1210-12 (S.D. Cal. 2023) (same); *United States v. Tita,* 2022 WL 17850250, at *5-*8 (D. Md. Dec. 22, 2022) (same); *United States v. Reyna,* 2022 WL 17714376, at *2-*5 (N.D. Ind. Dec. 15, 2022) (same); *United States v. Holton,* 639 F. Supp. 3d 704, 710-12 (N.D. Tex. 2022). *But see United States v. Price,* 635 F. Supp. 3d 455, 459-64 (S.D. W. Va. 2022) (finding § 922(k) unconstitutional).[2]

---

[2] *Price* is currently pending on appeal before the United States Court of Appeals for the Fourth Circuit. The *en banc* court heard argument on March 20, 2024. *See* Case No. 22-4609.

I concur with the courts that have upheld § 922(k) on its face as "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Although modern serial numbers did not exist when the Second Amendment was ratified, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 28. Here, the government has identified historical regulations that served to regulate firearms and "impose[d] a comparable burden on the right of armed self-defense." *Id.* at 29. Specifically, the government identifies:

> . . . Connecticut banned residents from selling firearms outside the colony. [*Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) (en banc)]. Virginia provided that people were at "liberty to sell arms and ammunition to any of his majesties loyal subjects *inhabiting this colony*." *Id.* at 685 n.18 (emphasis added; quotation marks omitted). And at least six colonies made it a crime (with severe penalties) to sell or provide firearms or ammunition to Native Americans. *Id.* at 685 (citing 17th-century laws from Massachusetts, Connecticut, Maryland, and Virginia); *see also* 6 Statutes at Large of Pennsylvania from 1682 to 1801 at 319-320 (1899) (1763 law); Laws and Ordinances of New Netherland, 1638-1674 (1868) at 18-19 (1639 ordinance), 47 (1645 ordinance), 278 (1656 ordinance).

\* \* \*

> Additionally, several states had laws relating to the inspection and marking of gunpowder, which "was essential to the operation of firearms at that time," meaning that gunpowder regulations "necessarily affected the ability of gun owners to use firearms for self-defense." *Miller v. Banta*, No. 3:19-cv-1537 (S.D. Cal. 2022) (D.I. 137-3, at 22) (Declaration of Prof. Saul Cornell); *cf Bruen*, 142 S. Ct. at 2149 (citing article by Cornell). In 1776, Rhode Island had a law requiring an inspector to mark a gunpowder case "with the two first letters of the manufacturer's name" and "with the letters U.S.A." 8 Records of the State of Rhode Island and Providence Plantations in New England, 18 (1863). New Jersey likewise had a law in 1776 requiring an inspector to mark gunpowder casks "with the Letters SN I." Rutgers, New Jersey Session Laws Online, Acts of the General Assembly of the State of New-Jersey, Legislature Number 1 at 7. In 1795, Pennsylvania enacted a law requiring gunpowder stored in the public magazine

8

to be proved and marked and prohibiting importation, transfer, or sale of any gunpowder that was not appropriately marked. 3 Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred 240-44 (1810).  In 1809, Massachusetts required the inspection of all gunpowder manufactured in the commonwealth or stored in a public magazine, with the inspector marking each cask as either "Massachusetts Inspected Proof" or "Condemned" and adding his name and the year. 2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822, at 199 (1823).  The law imposed a fine of between $200 and $500 on any person who sold any condemned powder or "fraudulently alter[ed], or deface[d] any mark, or marks, placed by any inspector upon any cask or casks containing gunpowder." *Id.*  New Hampshire adopted a very similar law in 1820. Laws of the State of New Hampshire, with the Constitutions of the United States and of the State Prefixed 277 (1830).

Colonial and early state governments likewise prohibited the manufacture and transportation of gunpowder without a license. *See* Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126 (1890) (1651 statute) ("no person . . . shall transport any Gunpowder out of this Jurisdiction, without license first obtained from some two of the Magistrates"); 15 The Public Records of the Colony of Connecticut 191 (1890) (1775 statute) (no "gun-powder made and manufactured . . . shall be exported out of the [Colony] without . . . license"); The Charter and Ordinances of the City of Providence, with the General Assembly Relating to the City 37.  Most importantly, at least two states in the early republic required gun barrels to be proved and marked and prohibited the obliteration of the proof marks. *See Heller,* 554 U.S. at 605 (observing that examination of the "public understanding of a legal text in the period after its enactment or ratification" is "a critical tool of constitutional interpretation" (emphasis omitted)).

In 1805, Massachusetts adopted a law for the appointment of "provers of fire arms" to "prove all musket barrels and pistol barrels" presented to them in exchange for a set fee. Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, at 259 (1807). The law was adopted to prevent firearms from being "introduced into use which are unsafe, and thereby the lives of the citizens be exposed." *Id.* Under the Massachusetts law, the prover was required to "stamp" the barrel "within one and a half inches of the breech" with the prover's initials, the letters "P." and "M.," and the year all in "letters and figures . . . so deeply impressed . . . as that the same cannot be

9

> erased or disfigured." Laws of the Commonwealth of Massachusetts, *supra,* at 260.  The act imposed a ten dollar fine on any person who manufactured within the Commonwealth "any musket or pistol, without having the barrels proved and stamped as aforesaid." *Id.* at 260. It also imposed a ten dollar fine for selling, delivering, or purchasing any unmarked musket or pistol manufactured in the Commonwealth. *Id.* at 260-61. And it imposed a fine of between $20 and $50 for any person who "shall falsely forge or alter the stamp of any prover of fire-arms . . . impressed on any musket or pistol barrel." *Id.* at 261. Massachusetts slightly amended this act in 1814 but kept the provision prohibiting alteration of the prover's stamp. Laws of the Commonwealth of Massachusetts from February 28, 1807 to February 28, 1814 at 536-37 (1814).
>
> Similarly, Maine in 1821 passed a law requiring the appointment of "suitable persons, to be provers of the barrels of all new, or unused firearms." Laws of the State of Maine 546 (1830). Each prover was required (in exchange for compensation) to "prove and try the strength of the barrels of all firearms which shall be offered to him for that purpose, in such manner as to satisfy himself of the strength of the same," to "in a permanent manner, mark and number every barrel by him so proved," and to provide a certificate attesting to the proof. *Id.*  The statute imposed a ten dollar fine on any person who "shall sell or offer for sale within this State, any new, or unused musket, rifle or pistol barrel, without having the same first proved, marked and certified." *Id.*  Additionally, it imposed a fine of "not more than one hundred dollars, nor less than twenty dollars," for any person who "shall falsely alter the stamp or mark or the certificate of any prover of firearms." *Id.*

(D.I. 64 at 16-19).

I agree with the government that that these historic precedents show a national history and tradition of the government regulating and marking firearms.  In particular, the 1805 Massachusetts law cited ("the 1805 law") requiring the proving and marking of gun barrels is instructive.  The 1805 law was enacted to protect citizens from firearms "which are unsafe, and thereby the lives of the citizens be exposed."  3 Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, at 259.  Under the law, the prover was required to "stamp" the barrel with the prover's initials, the letters "P." and "M.," and the year all in

"letters and figures . . . so deeply impressed . . . as that the same cannot be erased or disfigured." *Id.* at 260. The 1805 law imposed a ten dollar fine on any person who manufactured, sold, delivered or purchased a non-compliant musket or pistol as well as a larger fine on any person who "shall falsely forge or alter the stamp of any prover of fire-arms . . . impressed on any musket or pistol barrel." *Id.* at 260-61.

Although the 1805 law is certainly not a "historical twin," *Bruen* does not require such identity. *Bruen*, 597 U.S. at 29-30; *see also Rahimi,* No. 22-915, 2024 WL 3074728, at *10 (U.S. June 21, 2024) ("As we said in *Bruen*, a 'historical twin' is not required."). Both the 1805 law and § 922(k) were enacted in response to concerns for public safety presented by firearms. Both laws requiring that the firearm be marked and both include punishment for altering the markings. Accordingly, I find the historic evidence sufficient to show a history and tradition of marking firearms, as well as punishing the removal of the markings. Therefore, § 922(k) is constitutional on its face and does not violate Defendant's Second Amendment rights.

### III. CONCLUSION

THEREFORE, for the reasons set forth above, IT IS HEREBY ORDERED that Defendant's Motions to Dismiss the Indictment (D.I. 46, 61) are DENIED.

*Maryellen Noreika* (signature)
The Honorable Maryellen Noreika
United States District Judge